Case number 23-7080, et al. A state of Jeremy Isadore Levin, et al. James Owens, et al. Appellants v. Wells Fargo Bank, N.A. and United States of America. Ms. Smith for the appellants, a state of Jeremy Isadore Levin, et al. Ms. Wagner for the appellants, James Owens, et al. Mr. Huda for the appellee, United States of America. Mr. Lozettos for the appellee, Wells Fargo, N.A. Good morning. Just for the appellees, just so you know, we're going to hear from the government first, and then from Wells Fargo in case the list on the order suggested otherwise. Thanks, John. I've been in those seats with the time ticking down, worrying when I have to get up. Wells Fargo will be last. The time limits will be as established. Ms. Smith. Good morning, your honors. May it please the court, Suzelle Smith with 11th. So I'm back for the second time. Let's start. Since I have limited time, I'm really going to compress this and do speed chess here. One thing that everyone agrees on, in this case, everybody, is that what we have here are originally frozen or blocked assets frozen by executive orders, regulations, IEPA in October of 2019. Now, I am going to, and also everybody agrees that TRIA, the terrorist statute, is implicated by the fact of the freezing of these Iranian assets in 2019. Now, I'm going to paraphrase the government, but the government sets out the issue as the federal district court lacked jurisdiction under TRIA to issue the 11 writs because the specific OFAC license issued to DOJ here unblocked the assets which are still being held at Wells Fargo in a blocked account. The OFAC license at issue here did not unblock these assets, and it could not. First of all- It turns on whether or not the assets are still frozen, right? Yes, Your Honor. And whether- That's an undefined term. So we default to ordinary cleaning and usage. So for the term frozen, Your Honor? For the term frozen. So OFAC refers to blocked assets, then it defines blocked assets as- These were frozen, and those are undefined. And this is the first time that the argument has been made by the government or anybody else that blocked assets are not frozen when they're blocked under IEEPA and OFAC regulations. But we spent some time in our reply brief dealing with the fact that blocked assets and frozen assets are used as equivalents and as synonyms in the OFAC regulations, in the case law, and there's nothing that- there's no authority that blocked assets under the IEEPA and the regulations in the OFAC license. I'm sorry. Blocked asset is a defined term. Yes. Either seized or frozen. Correct. Everyone seems to agree the assets weren't seized. I disagree. We spent some time in the brief on seizures. Let's assume, I think, your argument- they have to be one or the other. They can be seized and- Seized or frozen. They can be seized and frozen. I think you're- so I think your frozen argument is stronger than your seized. So let's just- Let's deal with frozen. Let's deal with frozen. Undefined term. So we default to ordinary English usage. And I can imagine two plausible meanings of frozen in the phrase frozen assets. One is can you easily convert the assets into cash, and that's a good one for you. And you win if that's what that means. But I can imagine another one. I mean, frozen, a stronger sense of like absolute zero frozen. Like no one can do anything with the assets. And I'm not sure why that's wrong. And if that's the right way of thinking about frozen, maybe you have some difficulty because of the license. So, Your Honor, one of the reasons we spent a great deal of time going over frozen and blocked and their equivalencies is that the United States Supreme Court, the OFAC regulations, every source you can look at in the context, which is what this court needs to look at. We're not talking about frozen peas here. We're talking about terrorist assets that have been blocked and frozen under congressional law, under executive order, and under the regulation. But the reason that frozen can't mean cannot be dealt with at all, is that if it meant cannot be dealt with at all, then the government couldn't come in and get a license to deal with these assets under TRIA to operate and do what it wants to do, which is pursue its forfeiture case. The Levins, as victims under case law and binding authority, this circuit. Why is that? Why is that true? They were frozen by operation of IEPA and or the blocking order, and government came in and got a license, which might or might not have unfrozen. So, first they're frozen. I think we agree. First, they're frozen. Now, the question for the court is when the license to litigate was issued by TRIA, sorry, by too many initials here, by OFAC. When the license was issued, did that license unblock the assets, or was that license legitimate to do anything? If the assets are blocked and frozen, both the government and the victims, and the victims can do different things to try to collect on those assets. One thing the government can do and must do is go to OFAC and ask for a license to litigate, to come to court, to try to make its forfeiture claim. And if you look at the OFAC license itself, that is exactly what it does. And the OFAC license, Your Honor, refers multiple times to the blocked assets. The OFAC license doesn't say these are now unfrozen or unblocked. The OFAC license doesn't say that the government can go to the district court under the Forfeiture Act and receive those assets. What it says is this is not a transfer. If you look carefully at the license itself, it says this is not a transfer. This is not a final order. What this is is permission for the government to try to affect a turnover, which is not, of course, what the victims have to do. We don't have to go to OFAC. So Section 1A of the license does say in an unconditional way that the United States, the DOJ and other federal agencies are authorized to engage in all transactions necessary and ordinarily incident to affect the forfeiture of the funds. So I think the government says that is an affirmative authorization to deal in the funds and that before this license issued, nobody had any authorization to deal in the funds and you should regard that as unfreezing the assets. So the government's position is any OFAC license, not just this one, but any OFAC license that's obtained unfreezes and unblocks the assets. That's the government position. Because it authorizes the government to deal in the assets. The government actually says any license, not just the one that we're dealing with now. Let me deal with the ones that we're dealing with now. It specifically says authorized to affect the forfeiture in blocked funds. It doesn't say these funds are now unblocked or unfrozen, Your Honor. It says to affect a turnover. And then it goes on to say further down that the only way you get authority to actually receive those funds or to change the status, which are still held in Wells Fargo. Wells Fargo didn't pay them out to the government. It's conditional on coming to court and getting a valid final forfeiture order. And other words in the license say this license is conditioned on receiving such a valid forfeiture order from the district court. So the government doesn't have what it would need to actually move the possession of the funds through a forfeiture order to the government. So the government is faced with continued blocked funds and frozen funds. No authority that they become unfrozen or thawed out because of this conditional license. And there's no case cited by the government that such a conditional license as this would unfreeze or unblock. There's no case that says that. Not Holy Land. So all the cases that are cited by the government, Your Honors, they are first of all from other circuits, but they're old cases and they're old cases which don't deal with the issue before the court today. Some of the Holy Land, I think there was no judgment. We have a judgment. We're already ahead of the government, Your Honors. And since that, we have a judgment against Iran and we're just trying to collect. The government's trying to get started the forfeiture action under different theories. We don't have to prove that the assets were used. We just have to prove that they were property of. But the government is back in line and the district court held that it did not have jurisdiction to issue the writ in our case because this forfeiture action, this forfeiture license, not the filing, but the license, takes those assets out from under TRIA's notwithstanding language and shall provision that blocked assets, frozen assets shall be available. There just isn't any authority and no rational support. Does it matter whether the funds were blocked when you moved for a writ of attachment or does it matter whether the funds are blocked now? It matters whether the funds are blocked now, certainly, Your Honor. When the funds are blocked and you get your judgment, in every case over the past 40 years where we've been dealing with terrorist selection of judgments, what matters is are the funds blocked now so you can come into court and go and petition the court under TRIA. So there's no question here. These funds are blocked now and weren't unfrozen. So if Your Honor's rule appropriately and correctly, as we think you should, that nothing unfroze these, including this, and it couldn't under TRIA's notwithstanding language, then we're back to court with a valid writ. Thank you. We'll give you some more time. Thank you. Ms. Wagner, your turn. May it please the court. Jessica Wagner for the Owens, Muella, and Kalika Pelham. I'd like to reserve two minutes for rebuttal. I want to start by addressing this point about whether the funds are still frozen and blocked for purposes of TRIA and then discuss the prior exclusive jurisdiction doctrine. So beginning with that first point, the government cannot contest that today no one, not Iran, not Crystal Holding, not Wells Fargo, and not even the government is able to transact in the funds. The funds were blocked in an order issued under IEPA and TRIA defines a blocked asset as an asset that is frozen under IEPA. Here, the funds unquestionably meet that definition. May I ask you the question that I asked Ms. Smith? Are we supposed to figure out whether the funds are blocked now or are we supposed to figure out whether they were blocked when you moved for a writ of attachment? I don't think that the answer to that question matters because I think they're blocked both the time of attachment and they're blocked now, but if I had to pick one, I would say assess it at the time of attachment. And let me... Why is that? Why at the time of attachment? Why is that the time it matters? Yes. So if you look at the text of TRIA, it says first it defines a blocked asset as an asset that is frozen under IEPA, but then it says that license assets are not included within the definition of blocked asset where the license was specifically required by a statute other than  And I said, so the text of TRIA illustrates that where assets are blocked under IEPA, but then a license is issued under IEPA. The funds don't qualify as blocked assets for purposes of TRIA. That's why I think you should look at the time of initial time. But let me address why the funds are still blocked today. And there can be no question about that. From whose perspective do we consider whether the assets are frozen? It's from the government's perspective or from Wells Fargo's perspective? I think that the key perspective, Your Honor, is neither of those parties. It's Iran. Because TRIA says that you're attaching blocked assets to a state sponsor of terrorism. So the key is whether the assets are blocked as to the state sponsor of terrorism, which is Iran. But again, the assets here are blocked both as to Wells Fargo and as to the government. Let me talk about the actual forfeiture. Much more clear. I take your point about Iran. What I was thinking is the block is much clearer as to Wells Fargo, which can't do anything with them unless and until they get a forfeiture order. And then there's one only thing they can do, which is hand them over to the government. A little less clear as to the government. Their position is there are these assets out there. Someone else owns them. The government is proceeding with an adjudication to transfer ownership, and they're doing that. And that's sort of what they would do even without a blocking order. So from their perspective, it seems like there's been a significant fall. So I disagree with that, Your Honor, respectfully, because that's not what the license says. So if you look at the terms of the license, and this is at JA-402, it is a limited conditional future license. Now, again, the government's own regulations say that we have to, that licenses can unblock, remove blocking prohibitions, but only to the extent specifically stated by the terms. We have to look directly at the terms of the license. And the license here authorizes the government to take possession and ownership of the funds from Wells Fargo only after it has furnished a valid forfeiture order to Wells Fargo. Here, the government is far from having a valid order of forfeiture. And so the government cannot do anything with the funds today. So I'm going to ask a question that I asked before, which is, that's certainly true as to 1B, but for some reason, and I'm genuinely mystified by this, 1A is not conditional on securing a forfeiture order. And it's unclear to me what, if anything, 1A authorizes. So can you explain to me why the government might say 1A is not conditional so we can transact in the funds now? What's the answer to that? I mean, 1A is just, I think, a general statement that says the government can proceed with the forfeiture proceeding. But again, if the government had the funds already, that would be different. But because the funds are currently held at Wells Fargo and Wells Fargo is not authorized to do anything with them until we get to 1B, the government cannot do anything with the funds under the terms of the license. I think it's also instructive here, Your Honor, if you look at JA 287 to 288, which is where the government requested the license and it was to perfect forfeiture, it's very clear in the request of the license that it's asking for a license, authorizing it to take possession of the funds once it completes this forfeiture process. So I think you should look at that to inform the license itself. But again, 1A says it is authorized to engage in transactions necessary to affect the forfeiture, but there's nothing that it can do because the funds are at Wells Fargo and Wells Fargo is unauthorized to release them to the government until that condition in 1B is satisfied. So today, the government can't move the funds. But again, I think the key party is not even the government, it's Iran. And I think that that's the point about frozen, going back to some of your questions, Judge Kapsis. I don't think it matters because here the funds are frozen as to all parties, but from Truia's perspective, the key is whether the funds are frozen as to Iran. There's nothing in the statute that says it has to be frozen in every aspect. And I think it would be sort of observed to have a rule to that effect, especially when you're talking about the government, because the government is the one who blocks the funds in the first place. The government always has inherent authority and discretion to move the funds. You know, there's numerous cases the Supreme Court has talked about, you know, how... It's a fair point, except this whole scheme creates this weird distinction between OFAC and DOJ in its capacity seeking the forfeiture. It's not a unitary executive for that purpose. I mean, I would still argue that they're all under the executive branch, Your Honor. But again... They're two, but that's not how it works. Be that as it may, the key is it doesn't even really matter because the government can't do anything with the funds here. I do wanna just briefly address the other circuit court cases that have dealt with licenses. So this is... I just started before you... I do wanna hear that, but just very briefly. Is it your understanding that essentially in every civil forfeiture proceeding of this kind, the government needs an OFAC license that looks something like this to even start the process? So I would say in any instance where the funds are blocked, right? Obviously there's forfeiture proceedings where the funds are not blocked. Yes, that's right. Because... And this is... I mean, this is the way that the scheme works. When Judge Mannion explains this very well his opinion in the RJ O'Brien decision, but when funds are blocked under IEPA in order to be able to do anything with them under IEPA the way that this regime works, the government has to request a license under IEPA. And that's why we see the government here requesting a license once it initiated the forfeiture proceeding. If it didn't think it needed one, it wouldn't have done that in the first place. So turning... Turning to the cases is... I'll let you dive into them, but my sense was that your position is fully reconcilable with Rubin and Weinstein, but not reconcilable with Holy Land and O'Brien. In order for you to win on this point, you need to create a one-two split. So I would respectfully disagree. I think that there is a way for you to rule in our favor and reconcile all of these decisions. So I'll start by talking... You mean that one? Yeah. Do whatever order you want, but... I'll start by talking about those two cases that you think are not reconcilable. And I think here's the key distinction. In neither of those cases were the courts dealing with the text of the specific license here. In Holy Land, the Fifth Circuit, and in R.J. O'Brien, the Seventh Circuit, there was nothing to indicate that either case involved a conditional limited forfeiture license like we have here. In R.J. O'Brien, the text of the license was not even in the record or before the court. All they had was a stipulation regarding it and neither of the parties... I went back and looked for the briefs in this case, neither of the parties, while the court gave any indication or raised any arguments that we had these limited conditional terms here. It's not in Holy Land. I'll go back and reread it. But I thought the gist of it was there was a blocking order and then there's a license allowing the government to pursue a forfeiture. Is that not right? I think that license there also authorized the government to pursue restraining orders, at least from what the court says in the quoting it, but we don't have anything else about it and we don't have the limitations that we have here. So the government can't actually do anything with the funds, can't take possession of the funds until it obtains the final order of forfeiture. There was no term like that discussed in any of these cases raised by the parties or discussed by the courts. And I think another key point is the parties in both cases did not press the statutory argument that I referenced earlier, which is that the license was required by AEPA and because it was required by AEPA, by definition, it couldn't unblock the funds. In Holy Land, the Fifth Circuit didn't address that argument at all. And in R.J. O'Brien, the Seventh Circuit held that that issue was waived. So because we're dealing with a different license and because we have repeatedly before the district court and before this court raised these specific limited conditional terms of the license, as well as the fact that the license because it was required by AEPA because the funds were blocked under AEPA. I think there's a way that you can rule in our favor without creating a circuit. Do you think Judge Mannion was over-reading Holy Land? I took him to be saying that Holy Land establishes only what the government says here, but was wrongly decided. I do think that there were aspects of Holy Land that were wrongly decided. But I don't think that this court has to disagree with Holy Land to rule in our favor. So in Holy Land, the Fifth Circuit really, that's the notwithstanding clause of TRIA. How would we do that? One point which I get is to say the statutory issue wasn't addressed. So it's a drive-by. Is there anything else? You think the license was broader? Again, there is no indication that there were the specific limited conditional terms in those licenses. There was nothing that said that the government could not take possession or ownership of the funds until after it had obtained a valid order of forfeiture. And I guess the other point I would point out is the timelines in those cases were very different. In both Holy Land and in R.J. O'Brien, the government had already obtained licenses and proceeded with their forfeiture actions before the plaintiffs in those cases had even gotten judgments against the state sponsors of terrorism, let alone sought to attach the writ. So in Holy Land, by the time which involves criminal forfeiture, by the time that the plaintiffs were raising the TRIA argument, they were doing it after the government had already obtained a preliminary order of forfeiture, entitling it to a fund. That's completely different. The government doesn't have that here. Yeah, that's your fallback argument that you got your judgment lean in time. I'm just trying to focus on the threshold question, whether a license like this unfreezes. Yeah, and again, I think it can't for the two reasons, because one, the text of TRIA says that it can't. TRIA says that licensed assets are not blocked assets unless the license was specifically required by a statute other than AIPA. Here, the license was required by and issued under AIPA because the funds were blocked by AIPA. So there's a statutory reason why the license can't block the funds. And there's the factual reason that the terms of a license here simply just do not block the funds. Again, you can ask the government, no one today can transact in the funds. To say that they are not blocked would be totally incongruous with the actual facts on the ground. I just want to make sure, parsing the different arguments correctly. So I think the statutory argument you were just referencing is the one that depends on the exception. Correct. And, but even putting that aside, I understand, I very much understand the license-specific argument. You have another argument that the word frozen, before you look at the exception, it just means from Iran's perspective, not the U.S.'s perspective. And that argument may be right, but that's the argument that would be inconsistent, I think, with the Fifth and Seventh Circuits, right? That frozen is just from the perspective of the blocked entity. Yes, I don't know that they got into that argument in those cases. But, I mean, again, I was trying to outline a path for how you could rule in our favor without having to disagree with the Fifth Circuits. I think you could easily reach that argument. That's the broadest position. And I think it's right, just because, again, this is about TRIA. It's about whether the assets are blocked as to the state-sponsored pairs we're trying to attach. It's not really about whether the government can transact them. I mean, gains and more. The Supreme Court says that blocked assets are usually retained for the president's discretion. So whether the government can move them shouldn't really be relevant to the definition of whether they're blocked as to state-sponsored terrorism. I wonder what's wrong with this understanding of the civil forfeiture statute and TRIA. So as I understand it, the civil forfeiture statute says when the U.S. can seize assets, sort of like a sword. When can the U.S. still get something? And sovereign immunity, normally something of a shield for foreign countries. TRIA and FSIA take away that shield to provide immunity. That doesn't change anything about the sword. It doesn't change anything about what the civil forfeiture statute says the U.S. can and can't do. And if we look at it that way, they're not in conflict. And so the notwithstanding language in TRIA doesn't do any work to upset what the civil forfeiture statute says, which is these funds are in the custody of the attorney general. So the funds, again, are not actually in the custody of the attorney general. They're in the custody of Wells Fargo. That's only if we think the civil forfeiture statute in 981C doesn't apply. No, that is the actual facts of the record. They are held at Wells Fargo's account. The government, again, has not been able to take possession or ownership of them, and it's not authorized to do so by the terms of the license. But going to the TRIA notwithstanding clause point, which I think was the heart of your question, TRIA's notwithstanding clause is very clear. Victims of terrorism shall be able to attach flocked assets of state sponsors of terrorism notwithstanding any other provision of law. Congress enacted that provision after victims had been thwarted over and over, usually by the executive, from being able to go after blocked assets and obtain, satisfy their judgment. If I may interrupt. I thought, I agree with everything you just said there, but I thought that what the executive had done to thwart was, in part, invoking the FSIA, its ability under the FSIA to cancel out what the text that later Congress insisted on with TRIA. You're exactly right. That is one of the many things. I think that was a specific thing that prompted TRIA, but there have been a number of cases and issues prior to that point. But yes, the FSIA has a provision that allows victims to attach flocked assets. It allowed the president to waive that provision. The president did so almost immediately. And then Congress said, no, we're passing TRIA. Notwithstanding any provision of law does not have that broad presidential waiver provision. And so TRIA is very clear that victims of terrorism need to be able to have a substantive cause of action to attach flocked assets. And the government, the government says, well, you can do this in the context of a forfeiture statute, just bring your claims there. But they're being duplicative in that respect because they have already previewed for us their position, which is that in order to have standing in the forfeiture action, you have to have a valid right of attachment. And they point to, and this court has not addressed it to my knowledge, but other courts have held that judgment creditors have to have, unsecured judgment creditors don't have standing in a forfeiture action. To have standing, you have to have a valid linear attachment. The government is essentially saying, lose, lose. You can't have your writ action to get you the writ that gives you standing. And then you must bring your claims to the forfeiture action. We're going to say you don't have standing because you don't have a writ. I follow that. And I take the point about sort of the history and the purpose, the history behind TRIA and the purpose of TRIA. But what about TRIA's text should make me think it's a priority rule, it's a substantive rule about who gets a terrorist state's money, as opposed to just saying the terrorist state doesn't get to keep its money. I think the notwithstanding on a provision law is hard. I mean, this court said in Crowley that it's harder to imagine a clear statement than notwithstanding any other provision of law. And that means that any other provision of law that would conflict and get in the way of our ability to bring a substantive cause of action against the assets, TRIA overrides that. But it could, it could, it seems like it could instead mean notwithstanding any law that gets in the way of Iran being immune. And I agree with you. There's no other, let's say there was another statute out there that said Iran is not immune. That notwithstanding language would be very powerful in TRIA and we would read TRIA to preempt a statute or in this case, a background principle of sovereign immunity or the sovereign immunity. But it all, it seems like all it does is just say notwithstanding anything that might make Iran immune. Iran is not immune. Now that we've established that, let's see who gets to take Iran's money. And that question seems like it's answered by the civil forfeiture statute. So I respectfully disagree with that reading, Your Honor, for two reasons. First, I think the text of the statute is incredibly broad. Notwithstanding any other provision of law doesn't say it's not limited in any way to immunity. And then again, we go back to the history. Congress enacted TRIA after the executive branch waived this provision of the FSIA that allowed victims to attach blocked funds. Congress is very clear if you look at, go back to legislative history and some of the cases discussed this, that they were trying to ensure that victims of terrorism had a way to attach, satisfy their judgments and were able to attach blocked assets. Nothing that I'm aware of would indicate that they were trying to limit it to immunity. Notwithstanding any other provision of substantive law through the forfeiture statute. The other third point I would add is the district court and the government have essentially conceded that. I think it's very interesting when we're in the FSIA context, which was the other alternative basis for arrest. Both the government and then the district court accepted this argument, argued that the forfeiture statute exclusive jurisdiction and provision should apply. They don't make that argument in the context of TRIA because they recognize that TRIA notwithstanding clause overrides the substantive statute. I'm grateful and I appreciate that. If I could just one question on the commerce and in the United States question, the commercial activity United States question. Here we have a foreign seller using a foreign bank, foreign buyer using a foreign bank. Do you have any judicial precedent where those are the facts and the court says this is commercial activity in the United States? So I think the key is that the funds came through the United States. That's where that's that's how the United States got involved with the commercial transaction. That was my I understand. I think that may or may not be a winning argument. I'm just wondering if any court has dealt with those facts. Funds coming to the United States, but foreign seller, foreign buyer, foreign seller chooses a foreign bank, foreign buyer chooses a foreign bank. And the court says, well, because the funds came through an intermediate U.S. bank, it's commercial activity in the United States. You might still win even if a court hasn't said this already. I'm just wondering if a court has said this already. I'm not aware of a court that has said that already. And I can go back and think that I'm not aware of it off the top of my head. I just would again reiterate that the key is that it was commercial activity that was coming through the United States. If it was all overseas, we would not be here. We're here because it's in the United States. It's the priority question before us. So I had thought Judge Boasberg's reasons for rejecting your TRIA argument were number one, number one, unfreezing, and number two, prior exclusive jurisdiction. Neither of those really speak to the question of what's going to happen when you fight with the government and with the other claimants to figure out who gets how much of this pot of money. So I think again, that TRIA is notwithstanding any other provision of the law clause answers that question. Certainly that's the government. But the question about how TRIA does or doesn't interact with the civil forfeiture statute. Was not... Did Judge Boasberg address that? He certainly addressed the scope of a notwithstanding clause when he was talking about the prior jurisdiction doctrine. Again, when he talked about the FSIA basis for Brexit, which I was talking about earlier, he doubted that there wouldn't be the notwithstanding argument that there is in the TRIA context for those. I think that he did address that. I mean, ultimately... He certainly addressed it to prior exclusive jurisdiction. Yes. But we can resolve... We might resolve that issue in your favor without getting into anything that decides the question of how TRIA does or doesn't interact with the civil forfeiture statute. Yes. I mean, I think this court can certainly reserve that question for the future case. And again, once we have valid writs, which we would ask the court to write. Exactly, Your Honor. Because then that will be the question because the forfeiture action we have, once we got our writs, we intervened in the forfeiture action and raised the claim where we cited our writs because we had standing based on those writs. So I think that there could be a question in the future. I mean, I would say that the court could simply say now that notwithstanding the provision of law necessarily overrides forfeiture statute, but it can easily reserve that question for a future day. I do want to just speak briefly to the prior exclusive jurisdiction doctrine because we haven't talked about that. Three points here. Yes, Your Honor. First, the doctrine was never designed to put litigants out of court. It's supposed to be a procedural rule of forum selection, not a substantive rule of priority. Neither the government nor the district court were able to identify a single case extending the doctrine to cases before the same court, let alone for the same judge. Second, to the extent that the rationale of the doctrine, judicial economy and efficiency had any purchase here, that rationale was fully satisfied when Judge Bates transferred the actions to Chief Judge Roseberg. And notably, in their motion to reassign the writs, the government raised the prior exclusive jurisdiction doctrine. They said they were not asking for writs to be barred under that doctrine, but that the rationale, the doctrine should inform the justifications for transfer. In his opinion, Judge Bates cited the doctrine and the government's indication of it. And again, without formally applying the doctrine, said that the interest served by the doctrine informed his view that reassignment was the most efficient orderly way to resolve the dispute. And so then once the cases were before Chief Judge Roseberg, even the spirit of the doctrine was no longer an issue and it was fully satisfied. We understand. We'll give you some time on that. Thank you, Your Honor. All right, we'll hear from the government. Good morning, Your Honor. Brian Hudak from the U.S. Attorney's Office on behalf of the United States may please the court. The parties returned to this court again in these collection proceedings, which were filed against funds after the government instituted its forfeiture action with an eye to ceding the victim's compensation fund for terrorist victims. The forfeiture court exercised interim jurisdiction over them in that forfeiture case. On the first trip to this court, the court answered a very narrow question. Did Iran have an attachable property interest and funds block mid-transfer under TRIA and answer that question in the affirmative. On this appeal, the creditors asked this court to make much broader holdings, which will likely create chaos in this area of the law and risk unintended consequences in other cases. In contrast, the government asked the court to affirm on very narrow grounds that promotes uniformity in the law. I'll start first with the prior exclusive jurisdiction doctrine. The government agrees with Wells Fargo that the court should hold that doctrine applies here, which resolves both the TRIA and the Foreign Sovereign Immunities Act claims. Whichever proceeding first exercises in rem, quasi-in rem jurisdiction over the property, that exercise is exclusive until that suit reaches finality. It secures predictability for financial institutions and neutral holders of disputed property, chief concern from the Greenbaum panel opinion. It prevents multiple proceedings. The prior exclusive jurisdiction doctrine bar different parties from having claims against the same piece of property. If they are, if a court has exercised quasi-in rem or in rem jurisdiction over the piece of property, yes. If we're talking about- A claim can't even be litigated. Without intervening in that suit or seeking to participate in that suit to assert a claim. It typically, you would think of when you just have disputed issues of property. It goes to competing sovereigns fighting over the same piece of property. It probably goes to competing district courts competing over the same piece of property. It may go to different district judges in the same district competing, but I mean, all that's been solved. Chief Judge Boasberg has the three claims before him. Sure, your honor, but jurisdiction as this court has routinely held is measured throughout the proceeding. So it has to be there from the instant the suit is filed, the proceeding is filed all the way through its lifespan. So when these were filed, they were not filed- Jurisdictional defects can be cured. Can't be cured. They can be cured. Well, jurisdictional defects at the outside of the case- Or transfer. If someone files in a court without jurisdiction, that court can transfer to it, transfer the case to a different court which has jurisdiction. For personal jurisdiction, but for subject matter jurisdiction, the limitation cannot be waived. It cannot be excused. The court has an independent obligation to raise it on its own accord. These are not- And jurisdiction needs to last throughout the entire proceeding from the very instance it's filed to when cert is denied in the Supreme Court or if the Supreme Court issues its opinion. So I don't believe that subject matter jurisdiction defects can be resolved midway through the case and have them be cured. Moreover, if the prior exclusive jurisdiction doctrine turned- Suppose they filed today, filed writ of attachment in the DDC and say, please assign this case or this case must be assigned to Chief Judge Bozberg before the same decision. Again, I think the cases that we cite talk about suits, and there's a reason for that because the suits themselves will have substantive law governing the claims in them. The suits will have issues about who can participate in them and who cannot. And those suits are the thing that adjudicates the property rights of the participants. And so when we think of a typical dispute over with an innocent owner who is facing competing claims to the same piece of property- How, in your view, could these groups of plaintiffs litigate their TRIA and FSIA issues? They filed a separate action, you say this is prior exclusive jurisdiction, they try to intervene before they get the writ of attachment, and you say no standing because you're an unsecured creditor. Yeah, I think- And you're just converting this doctrine, which is at best a front-end screen to get everything before one tribunal, at worst, a squishy doctrine of comedy into an absolute priority rule that whoever files first gets the priority on the competing claims to the assets. I think when it comes- Wait, to answer your first question about how they could have pursued a TRIA attachment against these assets, if they had done that before the United States filed its forfeiture action, they could have. Isn't that impossible? The way these work is the only way the public learns is when you file a forfeiture action. Is that incorrect? That's incorrect. There are plenty of TRIA collection actions brought by victim creditors against assets that are blocked here in the United States where they are filed before the United States has sought to forfeit them. They get information from different sources. The Freedom of Information Act provides information. There is all sorts of information sources that is, my understanding, the creditors use to identify attachable assets, and they go after them. There are plenty of cases. Most of them are in the Southern District where creditors have sought to attach blocked assets before the United States has instituted forfeiture proceedings. Suppose they had done that and filed first. Yes. Would the prior exclusive jurisdiction bar the United States government from pursuing claims against the same assets? No, because those proceedings would have reached finality. The writs would have been issued. They would have created judgment liens in the property to be... And the United States, when it would file... And then they would execute. Well, the United States would file its forfeiture action, and they would have... Under your logic, they can't, because there's an attachment court on this hypo had prior exclusive jurisdiction. Yeah, if the court continued to consider itself to have the exercising jurisdiction over the pieces of property, there would, you know, that would be... That's how enforcement works, I think, right? You get the writ of attachment on the front end. You litigate whatever enforcement issues are open. Right. And then you get the execution order on the back end. Correct. So, you know, this would go into an area of what is, I think, highly technical law, where we are divining distinctions between quasi-in-rem and in-rem jurisdiction at that point in time. And we would have to really probe that. I, you know, this case does not respond, you know, raise those issues. So they're not in the briefs, and it has not been fully developed in this record. I think at a minimum, if they had obtained the writs of attachment and the government, after they obtained their writs of attachment, filed its forfeiture case, they would have standing in the forfeiture case to say, this is my property. They don't. They didn't come first. They came second. And they can't come and take away the government's forfeiture action as they both, you know, it's not just a writ of attachment. In their briefs, they set forth what they want to do. They want to execute on these assets and take them for their own. I'm not sure which creditor wants to do that, because if you read the notwithstanding clauses, abrogating the prior exclusive jurisdiction doctrine, I don't know how they can then use as a shield that doctrine to be first in time, first in right as a TRIA creditor. The Levin creditors here have three different actions against these same funds. And so maybe they go to South Dakota, even before the mandate issues in this proceeding, and go and say, court, lift the stay, give me the funds. It will create chaos, because under their interpretation, there is no limiting principle in the text of the statute that would prevent one TRIA creditor from going to a quicker federal judge who could exercise jurisdiction over the same asset and get a ruling. There's not a limiting principle in the text, because the text doesn't talk about this at all. And that is really why the prior exclusive jurisdiction doctrine needs to apply here. Otherwise, you will have chaos in this collection area. I'm sorry, why is there chaos if there is some mechanism through the prior exclusive jurisdiction doctrine or otherwise, to get before one judge all claims against the same piece of property, which has already happened? Well, but that's not, that's what happened as far as procedural measures. That was not the outset of the case. And also, if it doesn't apply, what happens to the South Dakota action? What happens to the Sunday District in New York action? We saw two groups. Maybe your prior exclusive jurisdiction argument is a lot stronger as to those cases which were filed in different courts. And it is to this one, these ones, which were filed in the same court and then moved to the same judge. I understand, Your Honor, but if the doctrine, they haven't cited a single case where the doctrine has been parsed that thinly. It doesn't come up. Well, it has come up. I mean, I think we cite in our brief a couple of cases where this case were filed in the same courthouse and the doctrine was used to preclude that the second time action. So I understand what Your Honor is saying. I understand that, you know, it seems unfair that if the government comes to an asset first, that the three accreditors are locked out of that asset to pursue it as a recovery for their compensation. But I think that's the congressional scheme. And it is reinforced by the more recent congressional enactments, which have civil forfeiture being a fundamental ongoing funding mechanism for the compensation fund where there are 14,000, 19,000 terrorist victims, including the Owens creditors. What they are trying to do here is get the funds for themselves, all 9.9 million of them and have nothing go to the other victims of terror that are participating in the fund. I mean, you might be right. There's something in the forfeiture statute that gives you priority over other claimants, even other claimants with terrorism judgments that obviously be a treaty issue. All I'm suggesting is like it would seem that those are issues to be sorted out before, you know, whichever judge or court takes control over that race. And certainly if the writ's attached, that will be a consideration that Judge Bozwerk will have to reach. I mean, one of the questions the panel had for my friends on the other side was, has the priority issue been addressed? It has not. If the writs stick here, we go to the forfeiture action, they ask any to participate and the government will argue it is a pre-existing forfeiture interest because the government's forfeiture interest arises the instant the funds are subject to forfeiture and their judgment leans in way after that. And you might win, you might lose, but that doesn't sound like chaos to me. Well, that doesn't sound like chaos for these creditors and the government here. But what if the South Dakota action proceeds and it goes forward and there's a turnover order, notwithstanding a forfeiture claim with claimants participating here? What if it goes forward in the Southern District in New York? And Your Honor, on that point, we sought to move to consolidate, we sought to move to consolidate and transfer the writ proceeding in New York with the writ proceedings here with the Levin plaintiffs. They resisted and the Southern District refused to do that. So it will create multiple forums exercising multiple perhaps incompatible orders to the same piece of property, which is a concern not just for the United States and its forfeiture efforts, but it is for Wells Fargo, as they expressed in their briefs. And the Greenbaum opinion expressed the number one concern in this area should be, not the number one concern, but a paramount concern in this area should be the risk of incompatible judgments to neutral holders of the property. Unless my colleagues have questions, you want to move on to Tria? Sure. So we talked a little bit about the license. My friends on the other side say it's a very limited conditional license. It is not. Section 1A of the license permits the United States to take any actions ordinary in incident to the forfeiture of the property here. That includes, in the United States' mind, ability to seize the property and take actual physical possession of it. It hasn't in order to have the creditors be able to vet their issues, because once the United States takes possession of it, there is sovereign immunity that protects it from attachment. The 1B provision authorizes transactions on behalf of the bank. So the bank can voluntarily surrender the funds to the United States under 1B once there is a final forfeiture. It doesn't speak to what the United States can do through its seizure power by going and seizing and taking custody of the funds and engaging in transactions ordinary in incident thereto to promote the forfeiture of the funds. The bank has possession over the funds right now. That is correct. And the bank can't do anything with the funds. It can't give them to Iran. It can't give them to, I forgot the name of the entities in the commercial transaction. It can't even give them to the United States right now. It could give them, well, the United States could take them, I would say, because the United States could seize and take possession of them under its forfeiture. I mean, Wells Fargo thinks, gosh, this is a mess. We're racking up these legal fees. We just want to be out of this. Here, the United States take the funds. I didn't think they could do that. I think if they were to express that to us, we would issue a seizure order and take the funds. I mean, maybe, but it's sure just whether you think of this from the perspective of the bank or even Iran, I think what we think is like on any colloquial understanding, these funds are still frozen. Right. I think that we would take the same understanding as the Seventh and Fifth Circuits in R.J. O'Brien and Holy Land, which is if once there is a permissible use for the funds, they are no longer frozen as used in the statute. And here, the permissible use is for the government. What's the affirmative reason for that? Right. I think at least there's a seemingly compelling story that the fundamental nature of an IEPA order is to block assets of the designated foreign entities from those entities. And whatever else has happened, that's still true. And so I think that's why it feels a little bit odd to say these are unfrozen or unblocked when they're blocked from the very person the order is, you know, the primary purpose of the order is to block them from.  And I think my response to that would be best illustrated in a hypothetical that's not really hypothetical because this occurred in another forfeiture case recently in district court. The government seized under IEPA and other authorities weapons that it identified as belonging to Iran in the Mediterranean. It then sought to forfeit those assets and at the same time obtained an OFAC warrant for the United States to transfer them to support fighters in the Ukraine. At no point in time, simply because Iran couldn't get back their weapons, would we ever say that those are frozen once the government was able to transfer them to others for their abuse? And if again, it's all government actors, it's all sovereign actions in that circumstance. But at the same time, I don't think that any TRIA creditor could have come in and said, I'm going to attach these munitions and claim them for myself, even though that the only permissible uses would have been sovereign purposes. And so I think you need to, that's where I think RJ O'Brien and Holy Land really come from is that, yes, it is a sovereign act, but that doesn't mean it's frozen. That doesn't mean it's immobilized for no use whatsoever. It means that the government is the one that can use it. And, you know, I would say if the court finds persuasive the reasoning of the dissent of Judge Mannion and RJ O'Brien, even his dissent talked about, well, when there's a general license, that certainly increases the assets from the inception. Well, the government has general licenses under the OFAC regulations. They're mentioned in our brief and they're found at 31 CFR 56557 and several other places in the OFAC regulations. And they say that all transactions prohibited by this part that are for the conduct of the official business of the United States government by employees, grantees, contractor thereof are authorized. The government obtains its specific forfeiture licenses out of respect for OFAC's regulatory regime and to make sure there are no ongoing specific concerns with the specific piece of property to be identified. But the government also has a general license to carry out its official business with regard to black blocked assets. Here, that official business includes seeking to forfeit the funds. And so if you, again, Judge Mannion created this specific license, general license distinction that I don't think necessarily applies. But if you think his logic is more persuasive than the majority in R.J. O'Brien, then the creditors here also fail under that same logic. I asked Ms. Smith and Ms. Wagner whether in trying to figure out whether these are blocked funds, we look to whether they were blocked at the time that there was a motion for writ of attachment or whether we look to whether they are blocked now. What's your position on that? I think they have to be blocked throughout. And I think that was the holding of R.J. O'Brien. And where it said something along the lines of, and I don't have the quote in front of me, but there is no promise under TRIA that the government will continue to block assets of an actor that will make them available for attachment. And I think that plays out with a plainly simple hypothetical. If, for instance, the United States and Iran normalize relations, enter into peace agreement, sanctions are dropped tomorrow. Unlikely, but say that happens and OFAC unblocks all the assets. I don't think Congress intended in those circumstances for predators of Iran to continue to attach them under TRIA. They may have other avenues or maybe other recompense. I know that this happened when sanctions were lifted against several African countries a couple of years ago. But I don't think in those circumstances, the president unblocking assets that the United States collected against Iran when we were adversaries would continue to allow for their attachment under TRIA necessarily if those relations improve. And it's your position that they were blocked even before the license. Sorry, that they were unblocked even before the license. It is our position that they were unfrozen, to use the term of the statute, when the United States filed this forfeiture complaint and it had a license, it had a general license. It got the specific license after the Owens plaintiffs filed a writ of attachment. Certainly, how does it work if I get that they were arrested on May 1st, the funds were, and the license issued on July 23rd. Between May 1st and July 23rd, I think the U.S. wasn't allowed to do anything with those funds. Is that correct? It needed a license? I think what we would say is, yes, we needed to take possession and transact in those funds, to seize them, we would need a license. So it seems like until the license on July 23rd, they were frozen. I think that there is a stronger argument that they were frozen, but I think under TRIA, again, if they need to be frozen throughout the proceeding because they, again, to- I understand that. So let's say that when the motion for a writ of attachment was filed by the Owens plaintiffs on May 22nd, that the court had granted that on the same day. It seems like maybe the court would have been allowed to do that because at that point, the funds were still frozen because the license had not issued. I think there is a stronger argument there. The one caveat- And then my question- Okay, well- The one caveat I will have is, I need to go back and look at when the general license for the United States to conduct its official business was implemented in the regulations. Understood. Now, so I understand- I think I understand what you're saying. And I guess it seems weird to me that the Owens plaintiffs' ability to get this money depended on whether the district court granted their motion quickly or slowly. It seems like it should have been a motion. Either the motion should have been granted or shouldn't have been granted. And the answer to that ought not depend on whether the district court moved fast. I think in this circumstance, that unique kind of factual wrinkle arises. In most circumstances, and if you look at most of the cases that we have pursued, we have the license in hand at the time of the filing of the forfeiture case. So it presents kind of a unique factual wrinkle here, given the timing. We have to decide- I understand, Your Honor. But I think that if you think that property blocked at the time the writ was issued, and the timing is when the writ was issued, not that it needs to continue to be blocked for them to be able to collect on it under TRIA. If that's your ruling, that we look at it when the writ of attachment was issued. When the motion was made. When the motion was made or when the actual writ was issued. I don't think there's difference in this case because I think both occurred before July, at the end of July, when we received our license. At least for the- So they shouldn't get their writ of attachment granted in this case? Yes, because then we move to quash.  So it doesn't apply to Levin's creditors, obviously, because their writ came much later, including their writs. You could rule for the Owens plaintiffs, rule against a Levin plaintiff, and it would not wreak chaos. Well, so that would just be for the freeze question. That does not answer the notwithstanding question in the prior exclusive jurisdiction doctrine. And I would just point to the court, as my friend on the other side has suggested, that that's a very broad clause. The holdings from this court contradict that. Just earlier this year in Doe against Taliban, where the court was interpreting the scope of the notwithstanding clause under TRIA, it said that courts have consistently rejected an expansive reading of the text of the TRIA as displacing anything that stands in the way of a particular plaintiff's collecting. So that was the holding of a panel of this court just earlier this summer in Doe. And I think it rejects affirmatively that this is a broad notwithstanding clause that's meant to circumvent all laws, all sources of laws, not even provisions of laws, but including fundamental common law jurisdictional concepts of the interim jurisdiction. What if I think that, that, I mean, it supersedes something, right? I mean, you tacitly, at least conceded that it, for example, supersedes 981C's exclusive jurisdiction provision that TRIA does. You have not argued. We have not argued that. We have not conceded that, but we have not argued that. I mean, what would that argument even be? That would be that not even a conflicting statutory provision, or would you say that doesn't, that does not conflict with anything specific in TRIA? I think we would adopt the arguments of the court in Holy Land, which said that the notwithstanding clause did not circumvent the criminal forfeiture statute and the provisions of the criminal forfeiture statute. It has several pages on that arguing that the notwithstanding clause is meant to take down barriers to execution, kind of the shield that Judge Walker was talking about earlier, not the sword. It wasn't meant to take away the sword and the provisions of the criminal forfeiture statute are the sword to parry and strike with, not the shield to deflect blows from the other side. I would also say that the purpose of, and the provisions of the law that it clearly does seek to circumvent are the presidential waiver provisions of 28 U.S.C. 1610F. And in fact, that's what the Supreme Court said was the purpose of the notwithstanding clause and the Lockheed. And it was also designed so that the TRIA creditors don't need to obtain an OFAC license themselves to take possession of the property. So it has weight. It just doesn't have the weight to circumvent the government's forfeiture authorities. At least that's our argument here. The prior exclusive jurisdiction doctrine is some kind of federal common law and federal statute would preempt federal common law, right? It could, and I think, hear me out. Cause I think you'll like where I go. Okay, well, good, good. 981C has the exclusive jurisdiction provision. It seems like it speaks directly to what the federal common law might otherwise have spoken to if it weren't for 981C. In that sense, 981C displaces the prior exclusive jurisdiction common law doctrine, but it displaces it in a way it's pretty good for you. It displaces in a way that says there's exclusive jurisdiction here and TRIA's notwithstanding clause doesn't conflict with that for the stored versus shielded. What's wrong with that? I think that'd be a perfectly fine holding for this court to reach. I think we approached it a little bit differently in our briefs as saying that 981C didn't necessarily displace the prior exclusive jurisdiction doctrine because it itself uses the jurisdiction thereof, which to us brought forth the soil of MRM jurisdiction with the statutory enactment as opposed to seeking to displace it clearly, which would be either in the text of the statute or by implication, the need to show an abrogation of common law. But if the court rules that taking away the shield is what the notwithstanding clause meant to do and not affect 981C, then the government would be happy with that outcome as well. Thank you, Your Honors. Good morning, Your Honors. Good morning. Alex Lakatos for Wells Fargo. I think I can be fairly brief. Just obviously as a neutral stakeholder, we're looking for clear rules of the road and not to be whipsawed in between different courts with potentially inconsistent decisions. And I don't think anyone disputes that that's a sort of reasonable goal and also might foster some judicial economy. Respectfully, the resolution that I believe Judge Katz has suggested for the prior exclusive jurisdiction rule, which would be if you get everyone in front of one judge, that satisfies the concern, would satisfy our concern. We wouldn't have inconsistent, the risk of inconsistent judgments and the like. Without that, I think it's not solved because of South Dakota and New York. If you look at the New York order that came out, it actually says Wells Fargo can't dispose of these assets without further order from the New York court. So we already are potentially ultimately facing some degree of conflict. We're from a problem that no one has put an issue here. I mean, right, the challengers here are just saying the prior exclusive jurisdiction doctrine doesn't apply to the actions that are filed in the same court. That doesn't call into question whether it would apply for actions in South Dakota or New York or anywhere else other than DDC. Obviously, this court can only rule as to DDC. We're hoping that if this court does that, other courts will do the same and not create a circuit split. Sort of like driving politely, you hope that others don't walk. We can't find a district court in South Dakota. Right, yeah, no, obviously. But we think that if this court makes the rule, then we have a better chance of taking that rule on the road and saying, look, this is how they dealt with it. It makes an awful lot of good sense. And that's why we'd like to see it happen here. Also within this specific case, if this were to come up again, it would make it mandatory that the solution that happened here, which is let's get everything in front of one judge, is the rule of the road as opposed to just, you know, fortunately it happened this time. Okay, thanks. Anything else? You have 40 seconds. No, no, no, I think you know where we're coming from. Thank you for considering it. All right, rebuttal, let's see. Ms. Schmitz. Thank you, Your Honor. Just to be clear, the forfeiture statute, not talking about the license, the statute, all the cases, including the district court below, everybody agrees TRIA preempts the statute by its own notwithstanding language and the cases we cited in our brief from this circuit emphasize that. The cases and the OFAC regs require the government to have a license to litigate or to try to do anything with blocked assets. We're talking about a specific class of blocked assets under the terrorist regulations. To litigate, the government needs a license and to take possession, the government needs a license. And Judge Garcia, to your point about Section B, if you can't, if you're litigating but you can't take possession, then that's a condition of the license. So it's conditional. The only reason the victims don't need a license is because of TRIA, the notwithstanding language of TRIA has been held to mean we don't need a license because it supersedes any license requirements that continue to apply to the government. The license cannot frustrate the purpose of TRIA under the notwithstanding clause. And if it did, it would be void. And this court has ruled, and we cite in our brief, that if an agency acts outside its power and authority, then that would be void. And so the license wouldn't be lawful, but the license does not do that. The license restricts itself to allowing the government to try to bring the forfeiture action. I want to address for one second the multiple form question because that lands squarely with me. To your point again, Judge Garcia, the victims don't know much about what's going on in the blocked asset world. It's possible to find out. We try to find out. It's difficult. Mostly we get it through the newspapers. But we filed in New York because we didn't know where the assets were. The government complaint didn't say where the assets were. And then we filed in South Dakota when we found out the assets were there as they still are. The reason for that, non-issue before this court, but there is case law that in determining the priority among the victims, the law of the jurisdiction where the assets are being held is the mechanism if we get to that point. So I just didn't want you to think I was filing cases all over the country for fun. We immediately said that we would stipulate to having the case in front of the D.C. court. It doesn't matter. A court should apply the law properly that applies here. If it's a judge in Washington or a judge in South Dakota, it doesn't matter. But ultimately somebody's got to go to South Dakota because that's where the assets are being held. Thank you. Thank you. A few quick points in rebuttal, Your Honor. First, the government has conceded that the filing of the forfeiture action does not unblock the assets. And I want to just quickly walk the court through that timeline. So on May 1st, as you said, the government filed a forfeiture action. On May 22nd, we moved forward to detachment. On May 25th, Judge Bates granted our motion. We then served those writs on Wells Fargo on June 10th. Later, on July 5th, the government for the first time requested a forfeiture license, which it didn't get until July 23rd. And I would submit that once we had our writs, TRIA's notwithstanding any other provision of law clause should have prevented any further operation of the forfeiture action that would bar our writs. Your Honor suggested that notwithstanding provision could be read narrowly, but again, it says notwithstanding any other provision of law. It doesn't say notwithstanding foreign sovereign immunity. In NLRB versus Southwest General case, the Supreme Court, this is quoting Webster's, says that the word notwithstanding shows which provision prevails in the event of a clash, where there is a clash between our substantive writs, ability to seek writs under attachment, and the forfeiture statute. TRIA has to trump the forfeiture statute. The government is also, I think it's notable, says that it doesn't have possession of the funds, but now it's saying that it could have come in and seize them, but that is simply wrong under the text of the license. The government can't point to anything a license that authorizes it to go in and seize the funds. It would have to get another license, rather section 2B of the license says that in order for Wells Fargo to relinquish custody, there has to be a valid final order of forfeiture. We don't have a valid final order of forfeiture. So if the government were to seize the funds and Wells Fargo were to give custody of them to the government, Wells Fargo would then be running afoul of this license. The government would need another license to do that. It cannot possess the funds. And then there is, finally, as we were discussing, there is no clash here. There's no risk of chaos between all these different liens. They were all consolidated before Chief Judge Boasberg. The pro-exclusive jurisdiction doctrine is supposed to apply between courts. If there is any concern about even different judges, that concern was fully satisfied, and so the court should rule in our favor. Thank you. Thank you, Your Honor.
judges: Katsas; Walker; Garcia